**NEW YORK INSTITUTE OF DIETETICS, INC., d/b/a New York Food and Hotel Management School, Plaintiff,**

v.

**Richard RILEY, Secretary of the United States Department of Education, in his official capacity, Defendant.**

**No. 96 Civil 1455 (DLC).**

United States District Court, S.D. New York.

June 9, 1997.

Wayne M. Josel, Bryan Cave, LLP, New York City (Ronald L. Holt, Kansas City, MO, of counsel), for Plaintiff.

Mary Jo White, Robert W. Sadowski, United States Attorney's Office, New York City, for Defendant.

## OPINION AND ORDER

COTE, District Judge:

Plaintiff New York Food and Hotel Management School ("New York Food") operates a private, post-secondary vocational school offering courses in cooking and restaurant and hotel management. It seeks a declaratory judgment that the Department of Education ("Department"), in determining plaintiff's financial responsibility to participate in programs under Title IV of the Higher Education Act of 1965 ("Title IV"), 20 U.S.C. § 1070, *et seq.*, may not consider a liability owed by an affiliated entity to the Department. The Department has moved for summary judgment. For the reasons stated below, the Department's motion is granted.

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on February 28, 1996, by filing a Complaint[1] and bringing an Order to Show Cause for a preliminary injunction and, requesting, *inter alia*, a Temporary Restraining Order("TRO"). This Court issued a TRO that same day which enjoined the Department from, *inter alia*, taking action that would make the plaintiff ineligible to participate in federal student financial assistance programs authorized by Title IV or that would impose on the owners of plaintiff, as a condition to provisional certification of the plaintiff for participation in a Title IV program, the requirement that they repay an obligation for the debts of a related entity, County Schools, Inc. ("CSI"), debts that arose from CSI's own participation in Title IV programs.

On March 8, 1996, the Government filed a motion for summary judgment. On August 7, 1996, the parties agreed and the Court ordered that the decision of the Department on the application for plaintiff's recertification would be remanded to the Department for supplementation of the Administrative Record and reconsideration, and that pending such decision the TRO would remain in effect. On October 17, 1996, the Department issued a decision following the remand ("October 17 Decision"). On October 29, 1996, the Court vacated the TRO. Following the October 17 Decision, the Government renewed its motion for summary judgment, which is now before the Court.

## FACTUAL BACKGROUND

The following facts except where noted are undisputed. Plaintiff is owned by Joseph M. Monaco, Sr. (the "father") and Domenic C. Monaco (the "uncle"). Joseph S. Monaco, Jr. (the "son"), is the director and vice-president of plaintiff (collectively, the "Monacos"). Plaintiff has participated in Title IV programs pursuant to a Program Participation Agreement ("PPA") dated September 1, 1991. The father and uncle were previous owners of CSI, another private, post-secondary vocational school located in Bridgeport, Connecticut. Beginning in the mid–1970s and up to the time it went into bankruptcy, CSI participated in programs pursuant to Title IV. Although CSI is not a party in this litigation, because of the significance both sides place on plaintiff's historical affiliation with CSI, and for reasons that will become evident below, a brief discussion of CSI-related activity leading to its demise is necessary.

### A. *Department Action Against CSI*

In April 1991, the Department of Education's Regional Inspector General for Audit (the "auditor") issued a "Final Audit Report" for the period July 1, 1988 through June 30, 1989, concerning CSI's administration of Title IV Student Financial Assistance ("SFA") programs. The auditor made two findings: (1) CSI "disbursed an estimated $18 million in SFA funds for students enrolled in an ineligible tractor trailer course," and (2) CSI "did not establish adequate internal controls to ensure accurate, fair and equitable refunds and that refunds totalling $2.6 million were not made timely by" CSI. According to the auditor, the tractor trailer course "failed to meet the course length requirements promulgated in Federal regulations and, therefore, did not qualify for participation in the SFA programs." The auditor thus recommended that the Department

> require [CSI] to reimburse Title IV funds totalling $6,170,484 which were disbursed for students enrolled in the ineligible Trac-

---

1. In Count I the plaintiff alleges that the Department's decision to impose provisional certification violates various statutory and regulatory provisions governing financial responsibility and administrative capability. Count II alleges the action is reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and is arbitrary and capricious. Count III alleges breach of the Settlement Agreements and the Supplement Agreement and Count IV alleges equitable estoppel. In Count V, the plaintiff argues that the Department's action violates the U.S.

Constitution's Fifth Amendment guarantee of Due Process. Count VI alleges a violation of the anti-discrimination provision of the federal bankruptcy laws, *see* 11 U.S.C. § 525(a). Count VII seeks a temporary restraining order and a preliminary injunction, based on the previous Counts. In addition to praying for declaratory relief, plaintiff prays for a permanent injunction "recertify[ing] N.Y. Food and Hotel without requiring compliance with the aforementioned unlawful conditions" of provisional recertification.

tor Trailer course during the 12–month period needed [sic] June 30, 1989. In addition, we recommend that [the Department] require [CSI] to provide an accounting of all Title IV funds disbursed for students enrolled in the : .. course since July 1, 1986 and return these amounts to [the Department] and the respective lenders. [CSI] officials estimate that these disbursements could exceed $18 million. In addition, [the Department] should require [CSI] to determine and return to [the Department] the amount of interest and special allowance and imputed interest associated with these disbursements.

Thus, the auditor's sole "hard" refund recommendation concerns funds "totalling $6,170,-484 which were disbursed for students enrolled in the ineligible Tractor Trailer course during the 12–month period needed [sic] June 30, 1989." The auditor further recommended that CSI "provide an accounting" of all such SFA funds disbursed since July 1, 1986, which funds CSI estimated "could exceed $18 million."

With respect to the auditor's second finding, the auditor found that CSI was not "financially responsible" under the regulations because it failed to meet its obligation to make timely and accurate refunds to lenders for students who withdrew from the school, and for charging such students excessive registration fees. It recommended, among other things, that CSI

identify all students who withdrew from school since July 1, 1986 and compute the amounts of Title IV student financial assistance that should be refunded to [the Department] or the respective lenders.

According to the auditor, CSI "agreed with the untimely refund issue." The Department issued a final program determination letter on August 28, 1991 (the "August 28, 1991 FPDL") endorsing the auditor's findings and recommendations. CSI filed an administrative appeal of the Department's determinations in October 1991.

**2.** Federal regulations define a "cohort default rate" as follows:

For any fiscal year in which 30 or more current and former students at the institution enter repayment on Federal Stafford loans or Federal SLS loans.. received for attendance at the institu-

CSI's troubles, however, went further. In June 1991, the Department notified CSI that its "cohort default rates" ("CDRs") for 1987, 1988 and 1989 were equal to or greater than 35 percent, thus rendering CSI ineligible to participate in the federal Guaranteed Student Loan ("GSL") programs.[2] The Department found the following CDRs: 51.9% for 1987; 37.2% for 1988; and 47.6% for 1989. CSI was also notified of its right to appeal its loss of eligibility, which it did, challenging the accuracy of the 1988 and 1989 CDRs.

According to plaintiff, the CDRs were made public, causing several banks to refuse to process federal funds already committed to CSI; it was this "severe interruption in cash-flow [that] created the insolvency." On September 12, 1991, CSI filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* The CDR appeal was denied by the Department on December 3, 1991, and CSI was thereupon informed that it was no longer eligible to participate in the GSL programs effective upon receipt of the notice. On December 10, 1991, the Department changed CSI's method of funding from "advance payment" to "reimbursement" status. The former allows a school to have an account with the federal government that it may access simultaneously with providing educational instruction to students. Under reimbursement status, however, the school must first spend its own money and then apply to the government for reimbursement. The Department explained that this action was taken based on the August 28, 1991 FPDL, the December 3, 1991 denial of the CDR appeal, and CSI's

failure to pay refunds on behalf of students Institutional officials and representatives [from CSI] have admitted that [CSI] owes approximately $1 million in refunds for the period immediately prior to filing a petition in bankruptcy....

According to plaintiff, the effect of the Department's denial of the CDR appeal, com-

tion, the percentage of those current and former students who enter repayment in that fiscal year on such loans who default before the end of the following fiscal year.

34 C.F.R. § 668.17(e)(1)(i)(A)(1).

bined with the change in payment status, led CSI to convert voluntarily to Chapter 7 bankruptcy dissolution status on December 16, 1991. CSI's December 16, 1991 letter so informed the Department. CSI further stated:

> this [letter] if [sic] formal notification that CSI is distributing a portion of funds previously held in escrow in accordance with the appropriate administrative priorities established under the Federal Bankruptcy laws of the United States.

On December 17, 1991, the Department issued an "emergency action letter," which barred CSI from "initiating commitments of Title IV" program funds, using its own funds or federal funds on hand to make Title IV grants or loans, or releasing to a student the proceeds of a GSL program loan and return such loan proceeds to lenders. The Department justified its action, among other reasons, because "CSI has failed to refund institutional charges of approximately $2 million owed to GSL Program lenders and directly to" the Department.

### B. *Debarment Actions*

On May 10, 1993, the Department issued a "Notice of Proposed Government-wide Debarment From Federal Nonprocurement Transactions" (the "Debarment Notice") to each of the Monacos. The Debarment Notice cited and incorporated by reference the emergency action letter, which charged CSI with failure to "refund institutional charges of approximately $2 million," and recited other alleged violations on the part of CSI. The Debarment Notices made no reference to the $18 million issue. The Debarment Notice further warned the Monacos of the consequences of debarment: ineligibility to receive federal financial and nonfinancial assistance or benefits from any federal agency under nonprocurement programs and activities, and inability to act as a principal on behalf of any person in connection with a covered transaction. During the administrative debarment proceedings, the Department stated that its reasons for seeking debarment were based

> on the failure of CSI to make approximately one million dollars in refunds owed by CSI to hundreds of students who withdrew from CSI and who had received Federal

Family Education Loan ("FFEL") Program loans.

The administrative debarment proceedings were suspended by joint agreement of the parties in January 1994. According to the parties' "Joint Motion to Suspend Schedule,"

> serious negotiations are currently underway to withdraw the three Debarment Notices. The Monacos and [the Department's Office of Compliance and Enforcement Division] have reached an agreement on the guidelines of such a withdrawal and the parties are currently in the process of drafting a written agreement.

The parties settled the debarment actions in August 1995.

### C. *Settlement Agreements*

The Administrative Settlement Agreement with respect to each of the Monacos (the "Settlement Agreements") provides, in relevant part, as follows:

> By virtue of this agreement to be prohibited from participating [in any programs under Title IV, each of the Monacos] will not be an officer, director, owner, partner, key employee or other person with management or supervisory responsibilities within any corporation, partnership, sole proprietorship, or any other legal entity participating in any of the student financial assistance programs authorized by Title IV....

However, with respect to the son, the Settlement Agreement provided that

> This Agreement does not prohibit Joseph S. Monaco from continuing to serve as the Vice–President and Director of the [plaintiff], providing that the following safe harbor provisions are all satisfied.

The "safe harbor" provisions were a limit in salary, benefits and other sources of compensation during the agreement's term. The father and uncle were not prohibited "from continuing to own and serve as a member of the Board and as a shareholder of [plaintiff]," providing compliance with analogous safe harbor provisions. Neither the father nor the uncle were permitted any "management or supervisory responsibilities or substantive control over [plaintiff's] administration of any

Title IV" program. The Settlement Agreements expressly provided that

> the parties have entered into this Agreement for the sole purpose of resolving the Department's debarment action without further cost or expense. No other consequence is intended by the parties and no other interpretation of the purpose or effect of this Agreement shall be implied.

The Settlement Agreements were made contingent on certain conditions: (1) each of the Monacos become "jointly and severally liable" for $200,000.00, pursuant to a Repayment Agreement also executed with the Settlement Agreements; (2) plaintiff agreed to guarantee the payment terms set forth in said Repayment Agreement; (3) plaintiff entered into an Institutional Participation Agreement Supplement ("Supplement Agreement") with the Department. Finally, the Monacos agreed "not to expand the participation of [plaintiff] . . . in any of the Title IV programs." The Department reserved the following rights:

> Nothing herein shall be construed as waiving, compromising, restricting, or settling any cause the Department may have to impose a subsequent debarment action against [the Monacos] for any activities other than those involving [CSI]. The Department retains the right to bring a debarment action . . . should [the Monacos] be convicted of any criminal action arising out of [their] involvement with [CSI].

(Hereinafter "Paragraph 11".)

The Supplement Agreement provides, in relevant part:

> the parties expressly recognize that nothing contained in this [Supplement Agreement] is intended to limit, in any way, the Department's right to pursue, either at this time or at any time in the future any administrative claim, audit claim, or fine, limitation, suspension, or termination action against [plaintiff] for its failure to perform its obligations arising under the Title IV Programs, or take other actions authorized by law. . . .
>
> The Department does not waive compliance by [plaintiff] with any Federal or state law or regulation, past, present, or future, applicable to [plaintiff's] administration of the Title IV programs; nor does this [Supplement Agreement] restrict any remedy otherwise available to the Department in relation to any violation thereof.
> . . .
> [Plaintiff's] participation in the Title IV Programs under this [Settlement Agreement] does not constitute a finding by the Department that [plaintiff] has met the standards of financial responsibility under 34 C.F.R. § 668.15(b) or (c).[3]

The Supplement Agreement obligated the plaintiff to post an irrevocable letter of credit for the benefit of the Department in the amount of $115,000.00, which "shall be available to the Department only for the purpose of ensuring that [plaintiff] does not default in its obligations to pay loan refunds under the Title IV FFEL programs." The plaintiff also agreed not to expand its facilities or curriculum, except under limited circumstances. Both the Supplement Agreement and the Settlement Agreements end on July 31, 2000. Following execution of these settlement-related agreements, the debarment actions were dismissed against all Monacos with prejudice.

### D. *Denial of Recertification and Provisional Recertification of New York Food*

Following the Department's February 7, 1995 request for a recertification application, plaintiff submitted its application on April 26, 1995. Although plaintiff's eligibility for participation in the Title IV program would have expired on July 31, 1995, its eligibility was continued on a month-to-month basis, pending the Department's decision, because it had a pending application for recertification. By letter dated January 18, 1996, the Department notified plaintiff of its decision to deny full recertification (the "January 18 letter"). Relying on 34 C.F.R. § 668.15(c)(1)(i)(A), the Department found that plaintiff did not meet the standards of financial responsibility because the father and members of his family exercised "substantial control" over CSI, and CSI owes a liability to the Department "of up to $18 million" that is not being repaid. The

---

**3.** Sections 668.15(b) and (c) are discussed *infra.*

Department's finding was based on the tractor trailer audit. The Department further found that plaintiff did not demonstrate at the end of its latest fiscal year an "acid test ratio" that is less than 1:1. *See* 34 C.F.R. § 668.15(b)(7)(i)(A). The acid test ratio generally represents the ratio of assets to liabilities; the Department found that plaintiff's cash and cash equivalents, plus current accounts receivable equalled $1,163,586.00, whereas its total current liabilities equalled $1,183,833.00. Finally, the Department found that plaintiff failed to meet the standards of administrative capability in that not all its CDRs for the fiscal years 1990, 1991 and 1992 were less than 25 percent. More specifically, the Department found the following CDRs: 34.3% for 1990; 36.5% for 1991; and 44.3% for 1992.

The Department decided to grant certification only if plaintiff agreed to (1) enter into a repayment schedule approved by the Department to pay the $18 million liability within 30 days from receipt of the January 18 letter; and (2) submit an irrevocable letter of credit in the amount of $103,000.00, in light of its failure to demonstrate a satisfactory acid test ratio. Plaintiff was given ten days from receipt of the January 18 letter to reply or otherwise the participation agreement would be allowed to lapse.

In response to a letter by the plaintiff dated January 24, 1996, in which plaintiff expressed its disagreement with all three grounds for denial of full certification and claimed that the January 18 letter's conditions were "in direct violation of the Administrative Agreements in Lieu of Debarment signed by the Department and the Monacos last year," the Department agreed to meet the plaintiff's representative on February 8, 1996, and, in preparation for the meeting, asked plaintiff to prepare a letter setting forth the issues to be discussed at said meeting. In its February 8 letter, plaintiff explained that the January 18 letter violated one of the primary interests in the Monacos' agreement to sign the Settlement Agreements: "to achieve a state whereby [plaintiff] was to be judged on its own merit and not to be punished for the Monacos [sic] previous relationship with [CSI]."

By letter dated February 15, 1996, the Department informed plaintiff of its revised findings and decision (the "February 15 letter"). With respect to plaintiff's first claim, the Department argued that the "sole grounds for the Department's debarment action was [CSI's] failure to pay student refunds," not the $18 million issue. Therefore, the Department was not foreclosed by the Settlement Agreements from raising the $18 million issue with plaintiff. The Department further relied on the Supplement Agreement's language, which, in its view, expressly left open to the Department the power to enforce the regulations concerning financial responsibility and administrative capability against the plaintiff. The Department, however, conceded that it had erred in its previous assessment of plaintiff's acid test ratio, and it further conceded that a prior stipulation precluded the use of the 1991 CDR against the plaintiff. Nevertheless, the Department disagreed that it is *per se* disabled from relying on CDRs currently on appeal, and that on the basis of the 1990 and 1992 CDRs, plaintiff still failed to demonstrate administrative capability.

The February 15 letter, therefore, still made recertification contingent on repayment of $18 million. It further found plaintiff (on the basis of the Monacos' past relationship with CSI) not financially responsible, and thus required a $515,000.00 letter of credit and placed the plaintiff on reimbursement, rather than "advance payment," status. Plaintiff was given until February 29, 1996 to accept these conditions.

In conferences with the parties, the Court noted a number of errors and inconsistencies in the Department's January 18 and February 15 letters. As a consequence, on August 7, 1996 the parties consented to the remand of the matter to the Department.

### E. *October 17 Decision*

On October 17, 1996, the Department issued its determination following further review of the plaintiff's application for recertification of eligibility to participate in Title IV programs. The Department found that the plaintiff did not satisfy the standards for financial responsibility due to the outstand-

ing liability to the Department of up to $18 million by CSI. The Department reviewed the Settlement Agreements and found that they did not preclude this result. According to the Department

> the intent of the parties with respect to what the Agreements covered and did not cover is clearly and unequivocally recorded in the Agreements. [which] state that "the parties have entered into this Agreement for the sole purpose of resolving the Department's debarment action without further cost or expense. No other consequence is intended by the parties and no other interpretation of the purpose or effect of this Agreement shall be implied."

Further, the Department expressly reserved the right in the Settlement Agreements to

> pursue, either at this time or at any time in the future any administrative claim ... or termination action against [plaintiff] for its failure to perform its obligations arising under the Title IV Programs, or take other actions authorized by law, whether set forth herein or elsewhere.

Finally, the Department quoted the provision from the Settlement Agreements in which the parties recognize that the "Department does not waive compliance by [plaintiff] with any Federal or state law or regulation, past, present, or future, applicable to [plaintiff's] administration of the Title IV programs .... " and that the Settlement Agreements do not constitute a finding that "[plaintiff] has met the standards of financial responsibility...." Consequently, the Department concluded that the Settlement Agreements "do not absolve the Monacos or [plaintiff] of all liabilities resulting from the Monacos' ownership and management of CSI." According to the Department, the Settlement Agreements were addressed to the debarment actions taken individually against the Monacos and the Department has an independent obligation to assess plaintiff's eligibility to participate in Title IV programs

under all the standards that apply to financial responsibility and administrative capability. In its October 17 Decision, the Department found that the plaintiff failed to satisfy both of these requirements.[4]

1. *Financial Responsibility*

The regulations require that "[t]o begin and to continue to participate in any Title IV, HEA program, an institution must demonstrate to the Secretary that the institution is financially responsible." 34 C.F.R. § 668.15(a). As described before, one of the criteria of financial responsibility is the so-called "acid test ratio" requirement of Section 668.15(b)(7)(i)(A). In the October 17 Decision, the Department conceded its error and, therefore, found no grounds for denying recertification on this basis.

The Department did, however, find that the plaintiff failed to satisfy another requirement of financial responsibility. Under Section 668.15(c)(1), .

> An institution is not financially responsible if [a] person who exercises substantial control over the institution or any member or members of the person's family alone or together. .[e]xercises or exercised substantial control over another institution ... that *owes a liability for a violation of a Title IV, HEA program* requirement ... and [t]hat person, family member, [or] institution ... does not demonstrate that the liability is being repaid in accordance with an agreement with the Secretary.

34 C.F.R. § 668.15(c)(1)(i)(A) and (ii) (emphasis supplied). As the Department determined in the February 15 letter, the father "and members of [his] family exercised substantial control over *[CSI]* .... [CSI] closed in 1991, owing a liability to the Department of up to $18 million." Title 20 of the United States Code, Section 1099c(e)(2)(A) provides that the Secretary

> may determine that *an* individual exercises substantial control over one or more insti-

---

4. The Higher Education Act ("HEA"), Title IV, governs federally funded, student financial aid programs for college and post-secondary vocational training. *See* 20 U.S.C. §§ 1070–1099 (Supps. 1990 & 1992). In 1992, Congress amended the HEA "to improve the accountability and integrity of institutions participating in Title

IV programs." *Career College Ass'n v. Riley*, 74 F.3d 1265, 1267 (D.C.Cir.1996). Among the various requirements that educational institutions must satisfy to participate in Title IV programs are those of financial responsibility and administrative capability.

tutions ... *if* the Secretary determines that ... *the individual* directly or indirectly *controls a substantial ownership interest* in the institution; ... or the individual is a *member of the board of directors,* the chief executive officer, *or other executive officer* of the institution.

20 U.S.C. § 1099c(e)(2)(A) (emphasis supplied). On this basis, the Department concluded that plaintiff did not satisfy the requirements of financial responsibility.

### 2. *Administrative Capability*

Section 668.16 sets forth the "Standards of administrative capability." In the October 17 Decision, the Department determined that the plaintiff did not satisfy the requirements of "administrative capability" on account of its unsatisfactory "cohort default rates." Section 668.16 requires that

> [t]o begin and to continue to participate in any Title IV, HEA program, an institution shall demonstrate to the Secretary that the institution is capable of adequately administering that program under each of the standards established in this section.

One of the standards pertains to the "cohort default rate" ("CDR"). With respect to Stafford loans and SLS programs, the Title IV participant must have a CDR "of less than 25 percent for each of the three most recent fiscal years for which the Secretary has determined the institution's rate." In the October 17 Decision, the Department determined that, because plaintiff's CDRs for 1990, 1992 and 1993 were each over 25 percent, it lacked administrative capability.

### 3. *Provisional Recertification*

In the October 17 Decision, the Department stated that it would provisionally recertify plaintiff through October 30, 1998 based on three conditions. First, within ten days of receipt of the October 17 Decision, the Department required the plaintiff to propose a repayment schedule, not longer than five years, to pay a $8,449,029 liability from the CSI tractor trailer program.[5] Second, the plaintiff had to demonstrate to the Depart-

ment that it had "sufficient financial and administrative resources to participate in the Title IV, HEA programs under a funding arrangement other than the Department's standard advance funding arrangement." This required the plaintiff to choose to be funded through reimbursements or an escrow arrangement satisfactory to the Department. Finally, the plaintiff was required to submit an irrevocable letter of credit to the Department equalling ten percent of its Department funding. The October 17 Decision noted that plaintiff had already complied with this third requirement.

The Department determined that recertification should be provisional because the plaintiff had failed to meet the standard of administrative capability. This was the only condition placed on the plaintiff as a result of this failure. The Department also required the plaintiff to accept the provisional recertification by October 31, 1996. If the plaintiff did not, its Program Participation Agreement with the Department would expire.

On October 25, 1996, the Court held a conference with the parties. At that conference, the plaintiff did not object to the provisional nature of the recertification, given the CDR determination. The plaintiff did, however, object to the determination that it lacks financial responsibility and rejected the offer of recertification based on the conditions. Thus, plaintiff was no longer eligible for Title IV funding as of October 31, 1996.

### STANDARD OF JUDICIAL REVIEW

Within the statutory framework of the Administrative Procedure Act, the Department's determination letter at issue here is an informal adjudication. Although "no provision of the APA contains specific procedures to govern an informal agency adjudication," it is well-established that informal agency adjudications "are reviewable under 'the generally applicable standards of § 706'" of the APA. *Occidental Petroleum Corp. v. S.E.C.,* 873 F.2d 325, 337 (D.C.Cir. 1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91

---

**5.** On remand, the Department substituted this figure for the $18 million in its January 18, 1996 and February 15, 1996 letters by revising its estimates of total disbursements and deducting loan repayments.

S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Thus, this Court may set aside an agency's findings, conclusions or actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Henley v. Food & Drug Admin.*, 77 F.3d 616, 619 (2d Cir.1996) (quoting 5 U.S.C. § 706(2)(A)). *Accord Dr. Pepper/Seven–Up Companies, Inc. v. F.T.C.*, 991 F.2d 859, 863–64 (D.C.Cir.1993) (informal adjudication reviewable under arbitrary and capricious standard); *Occidental Petroleum*, 873 F.2d at 337 (same)

■ Under the "arbitrary and capricious" standard, this Court must decide whether

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Henley*, 77 F.3d at 620 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)). Although the Court's review under this standard is "narrow and deferential," it

> must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.

*Id.* (internal quotations and citations omitted). The agency's decision, moreover, "must be adequately explained in the administrative record to allow judicial review." Finally, "[a]lthough this inquiry into the facts is to be searching and careful ... [t]he court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824.

■ Having defined the standard of judicial review, the Court must next decide what is appropriately within its scope of review. It is a well-established general principle of administrative law that the "focal point

for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *State of New York Dep't of Soc. Serv. v. Shalala*, 21 F.3d 485, 493 (2d Cir. 1994) (quoting *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (per curiam)). In the instant case, the record includes the original five-volume administrative recertification record developed during the first review and a two-volume supplemental record developed for the October 17 Decision. Further, plaintiff sent the Department a letter on September 30, 1996, designating additional materials for the record. The Department contends that it did not rely on these additional materials and therefore they should not be included as part of the administrative record that this Court should use in reviewing the Department's determination. The dispute centers on three affidavits of Joseph S. Monaco regarding his understanding of the Settlement Agreements. These self-serving affidavits should not be considered part of the record because the Department did not rely on them in reaching its October 17 Decision. In any event, the Settlement Agreements are unambiguous on their face and therefore there is no need to consider such parol evidence as these affidavits.

## DISCUSSION

Plaintiff contends that the October 17 Decision was arbitrary and capricious in five ways. I will discuss each argument in turn.

### A. *Settlement Agreements*

First, plaintiff claims that the Department's determination that it did not meet the financial responsibility requirements violates the letter and spirit of the Settlement Agreements. The Department maintains that the language of the agreements is unambiguous and allows the Department to consider CSI's liability when assessing the financial responsibility of plaintiff. Plaintiff contends that this Court should review the Settlement Agreements *de novo* and not grant deference to the Department's interpretation of the

agreements.[6] It does not, however, contend that the agreements are ambiguous; it merely offers its own construction of the agreements' provisions.

■ Generally, federal courts review agency determinations under the deferential "arbitrary and capricious" standard, *Chevron U.S.A. v. Natural Res. Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), including questions of law. *Osorio v. INS,* 18 F.3d 1017, 1022 (2d Cir.1994); *see also NLRB v. Commercial Workers,* 484 U.S. 112, 133, 108 S.Ct. 413, 425–26, 98 L.Ed.2d 429 (1987) (Scalia, J., concurring) (noting that the decision "demonstrates the continuing and unchanged vitality of the test for judicial review of agency determinations of law set forth in [*Chevron* ]"). An agency's interpretation of a settlement agreement, even when employing pure legal constructions of contract interpretation, is also entitled to deference under the principles enunciated in *Chevron*. *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1549 (D.C.Cir.1993) (citing *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.1987)).

■ The first step this Court must take, however, is to make a *de novo* determination of whether the Settlement Agreements are ambiguous. *Williams Natural Gas Co.,* 3 F.3d at 1551 (citing *Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991)). If the agreements are unambiguous, then I need not engage in a review of the agency's interpretation, instead, I rely on my own determination. *Id.*

■ If the language is ambiguous, then the second step for the Court is to defer to an agency's interpretation of that contract, so long as the interpretation is reasonable. *Long Island Lighting Co. v. FERC,* 20 F.3d 494, 497 (D.C.Cir.1994). This may not be true, however, where an agency's interpretation of a contract has vacillated, if Congress has indicated its desire that the courts engage in independent review of contracts, or if the agency is a party to the contract and might engage in a self-serving *post hoc* interpretation of the contract. *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Courts have not, however, adopted a standard of review for the third situation. *Alabama Power Co. v. FERC,* 993 F.2d 1557, 1570 n. 8 (D.C.Cir.1993). I will discuss each step in turn.

1. *Step One: De Novo Review of Settlement Agreements*

The issue is whether the Settlement Agreements unambiguously preclude the Department from using the CSI liability to condition or deny the plaintiff's Title IV eligibility. I find that the Settlement Agreements, in unambiguous language, do not preclude the agency action at issue here.

■ The agreements, described at length *supra,* define the scope of the settlements. Paragraph 5 states, in relevant part, that

the parties have entered into this Agreement for the sole purpose of resolving the Department's debarment action without further cost or expense. No other consequence is intended by the parties and no other interpretation of the purpose or effect of this Agreement shall be implied.[7]

---

6. Plaintiff improperly relies on *Mesa Air Group, Inc. v. Department of Transp.,* 87 F.3d 498, 503 (D.C.Cir.1996), as support for its argument. In *Mesa Air Group,,* the D.C. Circuit held that where Congress has plainly intended that subsidy agreements between the Department of Transportation and airlines be considered contracts, and not administrative regulations, the Court should interpret such contracts in accordance with "regular principles of contract law" and not engage in a deferential review of the agency's interpretation of the contracts. *Id.* The statutory language on which the Court relied in its analysis read: "[a]n agreement by the Secretary under this subsection is a contractual obligation of the Govern-

ment to pay the Government's share of the compensation." *Id.* (quoting 49 U.S.C. § 41737(d)(1)). Plaintiff has not pointed to any similar language in Title IV and therefore this Court will review the agency's interpretation of the settlement under the more deferential arbitrary and capricious standard.

7. Plaintiff cites sentences preceding that quoted above as support for its argument that Paragraph 5 should be read to preclude the agency action at issue here. Those sentences read

[t]his agreement does not affect Joseph S. Monaco's participation in non-procurement transactions with any Federal agency other

Plaintiff argues that this precludes the Department from considering CSI's liability in other contexts, even though on its face the provision expressly states that the sole purpose of the agreement is to resolve the debarment action. Plaintiff does not point to any particular ambiguity in the language, but rather contends that this provision should be read in light of the rest of the agreement and the attached agreement executed by plaintiff.

Plaintiff's main argument is that Paragraph 11 should be read as a limitation on Paragraph 5. In Paragraph 11, the Department reserved the following rights:

> Nothing herein shall be construed as waiving, compromising, restricting, or settling any cause the Department may have to impose a subsequent debarment action against [the Monacos] for any activities other than those involving [CSI]. The Department retains the right to bring a debarment action ... should [the Monacos] be convicted of any criminal action arising out of [their] involvement with [CSI].

Plaintiff contends that the "sole purpose" language in Paragraph 5 includes both a settlement of the debarment action and a limitation on what the Department can pursue in the future, that is, that the Department can only pursue the Monacos with regard to CSI if there is a criminal action. I disagree. When paragraphs 5 and 11 are read together, they state in unambiguous terms that the Settlement Agreements settle only the pending debarment actions against the Monacos for their activities with CSI; that in the event the Monacos are convicted for their CSI activities, the Department may reinstate the debarment actions; and that the Settlement Agreements contain no limit on the Department's right to bring a debarment action against the Monacos for activities unrelated to CSI. Nothing in these provisions limits the Department's right to enforce the financial responsibility regulations

against the plaintiff based on the CSI liability.

Next, the plaintiff tries to distinguish and limit language in the Supplement Agreement which expressly preserved the Department's authority to enforce its regulations against the plaintiff. The plaintiff argues that these provisions should be understood to require only that the plaintiff adhere to the Department's regulations in connection with its own operations. The Supplement Agreement provides, in relevant part, that

> the parties expressly recognize that nothing contained in this [Supplement Agreement] is intended to limit, in any way, the Department's right to pursue, either at this time or at any time in the future any administrative claim, audit claim, or fine, limitation, suspension, or termination action against [plaintiff] for its failure to perform its obligations arising under the Title IV Programs, or take other actions authorized by law....

> The Department does not waive compliance by [plaintiff] with any Federal or state law or regulation, past, present, or future, applicable to [plaintiff's] administration of the Title IV programs; nor does this [Supplement Agreement] restrict any remedy otherwise available to the Department in relation to any violation thereof.

> ... [Plaintiff's] participation in the Title IV Programs under this [Settlement Agreement] does not constitute a finding by the Department that [plaintiff] has met the standards of financial responsibility under 34 C.F.R. § 668.15(b) or (c).

The plaintiff's construction would require this Court to add a limitation on the Department's right to enforce its regulations regarding financial responsibility that is simply not present in the Settlement Agreements. To the contrary, these provisions, which relate specifically to plaintiff, explicitly reserve to the Department the very rights it has exercised in its review of the

---

than the Department. Joseph S. Monaco's agreement to the settlement is not to be taken as an admission that cause for debarment existed or did not exist. By entering into this Agreement, Joseph S. Monaco is agreeing to refrain only from those activities and transactions specified herein....

Plaintiff argues that Paragraph 5 was intended to limit the behavior of the Monacos as well as define the objective of the Settlement Agreement. I fail to see how this additional purpose of Paragraph 5 in any way detracts from the express language which defines the scope of the Settlement Agreement.

pending application for recertification. In particular, the provisions specifically state that the Department will need to determine plaintiff's financial responsibility under Section 668.15(c), a provision which requires the Department to consider whether a person who exercises substantial control over the plaintiff also "exercised substantial control over another institution ... that *owes a liability for a violation of a Title IV, HEA program* requirement...." Therefore, the reference to that section put the plaintiff on notice that the CSI liability could be used against plaintiff.

█ A contract is ambiguous if it is susceptible to more than one meaning when viewed objectively and in light of the entire agreement and the parties' customs and practices. *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095 (2d Cir.1993). In that case, the court held that

> [a]lthough [ ] parties dispute the meaning of specific contract clauses, [the Court's] task is to determine whether such clauses are ambiguous when read in the context of the entire agreement. By examining the entire contract, [the Court] safeguard[s] against adopting an interpretation that would render any individual provision superfluous.

*Id.* (internal quotations and citations omitted).

In the instant case, the rest of the Settlement Agreement, as well as the Supplement Agreement executed by the plaintiff, support the plain meaning of paragraph 5: that is, that the agreements expressly provide that they govern only the debarment proceedings, and thus do not preclude the Department from using the CSI liability when determining plaintiff's Title IV eligibility. For the above reasons, I find that the Settlement Agreements are unambiguous and thus I need not rely on the Department's interpretation of those agreements.

### 2. *Step Two: Deference to Agency Interpretation*

█ Even if I were to rely on the Department's interpretation, I find that such interpretation was reasonable. The Depart-

ment found that the plain letter of the Settlement Agreements state that the settlement did "not constitute a finding by the Department that [plaintiff] has met the standards of financial responsibility" as required by the regulations, and the regulations condition recertification on repayment of the liability of affiliated schools. 34 C.F.R. § 668.15(c)(1). The Department found the settlement—which was entered to resolve on an emergency basis a crisis regarding CSI's failure to pay student refunds—was not addressed to the debt arising from the tractor trailer program, settled only the debarment action against the Monacos individually, and did not waive all liability for the plaintiff.

Although the Department was a party to the Settlement Agreements, there are no facts on the record to suggest that it engaged in a self-serving interpretation of those agreements that was at odds with the language, purpose or structure of the Settlement Agreements such that I should accord its determination less deference. Moreover, I place great importance on the Department's familiarity with the issues involved: specifically eligibility for Title IV funds. Such familiarity is one of the principles underlying judicial deference. *Texas Eastern Trans. Corp. v. FERC,* 966 F.2d 1506, 1509 (D.C.Cir.1992). Additionally, the agency's interpretation of the agreements is undertaken specifically for a regulatory purpose, and not to determine the contractual rights of the parties in some other context. *Williams Natural Gas Co.,* 3 F.3d at 1550. The Department's interpretation is reasonable and thus this Court would defer to it.

Finally, even if this Court were to apply a non-deferential standard and review the agreements *de novo,* I would find, as I did above, that using standard principles of contract interpretation the agreements in unambiguous language resolve only the debarment actions and explicitly preserve for the Department the power to use the CSI liability when determining the financial responsibility of the plaintiff.

### B. *Estoppel*

█ Second, plaintiff argues that the Department should be estopped from using

CSI's liability against the plaintiff because the Department misled the plaintiff into thinking that the Settlement Agreements would not adversely affect its eligibility for Title IV funds. Declining to decide whether estoppel could ever run against the Government, the Supreme Court has noted that the public interest of the government in enforcing the law

> free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealing with their Government.

*Heckler v. Community Health Serv.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984). See *also Petrelli v. City of Mount Vernon,* 9 F.3d 250, 256–57 (2d Cir.1993) (citing *Heckler); Patton v. Dole,* 806 F.2d 24, 30 (2d Cir.1986) (noting limited circumstances in which the government may be estopped). In the instant case, plaintiff has not pointed to any evidence that would support the application of estoppel against the Department. That is, even if there were misunderstandings between the parties regarding the effect of the Settlement Agreements, there is no evidence that plaintiff has not received the minimum standard of honor, decency and reliability citizens are entitled to expect from their Government.

■■■ Moreover, the plaintiff has not proven the basic elements of estoppel. If the doctrine of estoppel were available against the federal government, a private party would be required at a minimum to prove the elements of estoppel and that the government acted to mislead the party. *Heckler,* 467 U.S. at 59–61, 104 S.Ct. at 2223–25. The elements of estoppel are a misrepresentation of fact on which another person reasonably relies. *Id.* at 59, 104 S.Ct. at 2223–24. Estoppel may exist where "a private party is deprived of something to which it was entitled [as] of right" but not where it was "induced to do something which could be corrected at a later time." Id. at 62, 104 S.Ct. at 2225. Plaintiff has not pointed to any legal right that has been damaged. While it argues that the Department induced it to sign an agreement which now affects its Title IV eligibility, this is not a legal right.

There was no guarantee that the Department would approve the plaintiff's April 26, 1995 recertification application, which was then pending, at the time the Settlement Agreements were executed. For these reasons, I find that plaintiff has not demonstrated the elements of estoppel nor the higher burden necessary for invoking the doctrine against the federal government.

## C. *The HEA and its Regulations*

■■■ Third, plaintiff argues that the Department failed to exercise the discretion it has under Section 668.15(d)(4), which states that "[t]he Secretary may determine an institution to be financially responsible even if the institution is not otherwise financially responsible" because of a debt owed by an affiliated institution. 34 C.F.R. § 668.15(d)(4). Plaintiff contends that if the Department had fairly considered the Settlement Agreements it would have relieved the plaintiff of any financial responsibility for CSI's debt since the Settlement Agreements effectively deprive two of the Monacos from any substantial ownership or management of the plaintiff. Defendant maintains that the plaintiff does not qualify for this discretionary relief because it cannot show one of the three mandatory conditions, namely that it (1) has repaid a percentage of the debt; (2) is currently repaying the Department for the debt pursuant to a written agreement; or (3) that the person applying for the certification did not control the affiliated institution that incurred the debt. 34 C.F.R. § 668.15(d)(4)(ii)(A), (B), & (C). Moreover, although plaintiff argues that the senior Monacos are not involved in the management of New York Food, the senior Monacos are the sole shareholders of the plaintiff, members of its board of directors, and recipients of the plaintiff's profits. The son is the vice president and a director of the plaintiff. He also receives an annual salary of $185,940 plus benefits. Based on these facts, it was not arbitrary and capricious for the Department to determine that the plaintiff did not qualify for discretionary relief of CSI's debt pursuant to Section 668.15(d)(4)(ii)(C).

### D. Anti-Discrimination Provision of the Bankruptcy Code

Fourth, the plaintiff argues that the Department's assessment of CSI's liability against the plaintiff violates the anti-discrimination provision of the Bankruptcy Code. 11 U.S.C. § 525(a). That provision states that *a governmental unit may not* deny ... or *refuse to renew a* license, permit ... or other similar *grant to,* condition such a grant to, discriminate with respect to such a grant against ... *a person that is* or has been *a debtor* under this title ... *or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor* under this title or a bankrupt or debtor under the Bankruptcy Act....

11 U.S.C. § 525(a) (emphasis supplied). Plaintiff contends that the Department's consideration of CSI's liability in determining the financial responsibility of plaintiff is discrimination prohibited by Section 525(a).

As plaintiff acknowledges, however, bankrupt institutions are ineligible for Title IV funds and thus not protected by Section 525(a). Section 1088(a)(4)(A) of Title 20, United States Code, states that

*an institution shall not be considered* to meet the definition of an institution of higher education.. *if the institution,* or an affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management or policies of the institution, *has filed for bankruptcy.*

20 U.S.C. § 1088(a)(4)(A) (emphasis supplied). Plaintiff argues that this exception does not include the affiliates of bankrupt institutions and thus Section 525(a) protects plaintiff who is merely associated with a bankrupt institution and is not bankrupt itself. The Department argues that plaintiff's affiliation with a bankrupt institution—CSI—is not the "sole" reason for the Department's determination that plaintiff did not meet the standard for financial responsibility. To the contrary, the regulations require that the Department consider the liability of affiliated schools regardless of whether those schools are in bankruptcy or not.

This Court agrees. The Department was required to look at CSI's liability and making a determination based on CSI's failure to repay a debt was not discrimination on the basis of bankruptcy.

### E. Amount of CSI Liability

Finally, plaintiff contends that the CSI liability should be restricted to grant disbursements for the period July 1, 1986 until June 30, 1989, and not include the debt of $1,385,258.18 incurred between January 1 and June 30, 1986. Plaintiff argues that this period is properly excluded because of the parameters of the CSI audit. I agree with the Department that its decision to tally the debt owed during the period January 1, 1986 until June 30, 1989 was reasonable because the ineligible tractor-trailer programs started as early June 1984 and because this was the period specified in the CSI draft audit report.

Plaintiff also argues that the Department failed to consider a determination by an administrative law judge that a course given by an unrelated entity that required 279 hours of training was sufficient to qualify for eligibility for programs that required 300 hours. *In re National Training, Inc.,* Dkt. No. 93–98–SA, U.S. Dep't Educ. (Oct. 18, 1995). The Department contends that it made a final determination that the CSI program required only 193.6 hours to complete, far short of the requisite 300 hours. Plaintiff's attempt to relitigate the merits of the CSI eligibility determination at this late stage is inappropriate. There was ample evidence in the administrative record to find that the CSI program was woefully inadequate to qualify for federal funds. Thus, plaintiff's objection is unavailing.

### CONCLUSION

For the above reasons, it is hereby

ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that the Clerk of Court shall enter Judgment for the defendant and close the case.

SO ORDERED.